# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sharon Halverson,                                   Civil No. 08-784 (JNE/SRN)

      Plaintiff,

    v.                                          <u>**REPORT AND RECOMMENDATION**</u>

Michael J. Astrue, Commissioner of
Social Security,

      Defendant.

---

    Lionel H. Peabody, Esq., P.O. Box 10, Duluth, Minnesota 55801, for Plaintiff

    Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Sharon Halverson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for supplemental security income. This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The parties have filed cross-motions for summary judgment. For the reasons set forth below, this Court recommends that Plaintiff's motion be granted as to remand but denied as to reversal, and that Defendant's motion be denied.

## I.    BACKGROUND

### A.    Procedural History

    Plaintiff filed an application for supplemental security income (SSI) on June 25, 2004, alleging a disability beginning November 1, 2003, due to bipolar disorder, migraines, and

problems with her knees and hips.  (Admin. R. at 67-68, 150.)  The application was denied

initially and on reconsideration.  (<u>Id.</u> at 37-42, 50-53, 56-58.)  Plaintiff timely requested a

hearing, which was held before an Administrative Law Judge (ALJ) on August 18, 2006.  (<u>Id.</u> at

59, 671.)  The ALJ issued an unfavorable decision on October 19, 2006.  (<u>Id.</u> at 12-24.)  Plaintiff

sought review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the

request for review.  (<u>Id.</u> at 6-9.)  The ALJ's decision therefore became the final decision of the

Commissioner.  <u>See</u> 42 U.S.C. § 405(g); <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir.

1992).  Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

> ### B.    Factual Background

Plaintiff was thirty-eight years old when she filed her SSI application.  (Admin. R. at 23.)

She has not completed high school and has been unable to obtain her GED after several attempts.

(<u>Id.</u> at 684-85.)  Her work history is limited.  (<u>Id.</u> at 171.)  At the time of the administrative

hearing, she had not worked full-time since 1992, when she was a hostess at a restaurant in

California.  (<u>Id.</u> at 676-77.)  Recently, she worked part-time at a tanning salon.  (<u>Id.</u>)

Plaintiff testified at the administrative hearing that she was no longer married, had three

children, and lived alone in an apartment.  (<u>Id.</u> at 675-76.)  She testified that depression over her

divorce and losing custody of her children caused her to be unable to work as of November

2003.  (<u>Id.</u> at 677.)  She was treated for depression and anxiety with counseling and medications

including Trazadone, Seroquel, Buspar, Klonopin, Mirtzapine, and Celexa.  (<u>Id.</u>)  She did not

suffer side effects from the medications.  (<u>Id.</u> at 683. )

Plaintiff also testified that she suffered physical pain from fibromyalgia.  (<u>Id.</u>)  She had

pain and numbness with sitting, standing, and using her hands.  (<u>Id.</u> at 682.)  She was in pain

every day but did not take any pain medication.  (<u>Id.</u> at 683.)

Plaintiff further testified that she had ADHD and was distracted very easily.  (Id.)  She had panic attacks once or twice a day and felt like she could not leave her home.  (Id. at 685.)

Plaintiff admitted she did very little during a typical day.  (Id.)  Her television was on all day, but usually just so she could hear someone's voice.  (Id. at 679.)  Plaintiff testified that her children came to see her, but she did not have any friends.  (Id. at 679-80.)  She admitted to using marijuana when someone brought it to her, but this did not happen routinely.  (Id. at 680-81.)

Jennifer Isaac, a community support worker, testified that she had been working with Plaintiff for several years and had contact with her daily or weekly.  (Id. at 686.)  Ms. Isaac testified that Plaintiff would miss more than three days a month from work due to her illnesses including bipolar disorder, anxiety, and suicidal thoughts.  (Id. at 687.)

### C.    Medical Evidence

On May 1, 2002, Plaintiff went to Gateway Family Health Clinic for a follow-up appointment concerning her anti-depressant medication.  (Id. at 370.)  She reported hearing voices telling her to kill herself.  (Id.)  Plaintiff was noted to have acted out by throwing knives into the woodwork at her home.  (Id.)  She was under marital stress and was diagnosed with depression with schizophrenic features.  (Id.)  Plaintiff was given Xanax for severe anxiety attacks and was also started on Zyprexa.  (Id.)  Two weeks later, Plaintiff reported the Zyprexa was working well.  (Id. at 369.)  Her paranoia was gone, and she was no longer hearing voices. (Id.)

Plaintiff was hospitalized for six days after taking an overdose of Tylenol in June 2002. (Id. at 178-85.)  This incident occurred when Plaintiff was distressed to learn her husband was planning to seek a divorce.  (Id. at 178, 257.)  The attending physician at Miller Dwan Medical

3

Center noted that Plaintiff had a history of bipolar spectrum disorder.  (Id. at 178.)  Plaintiff was diagnosed with bipolar disorder, NOS; adjustment disorder with mixed disturbance of emotions and behavior; cannabis abuse vs. dependence; and significant interpersonal/marital stressors. (Id. at 179.)  Upon discharge, Plaintiff reported feeling quite well and denied suicidal ideation. (Id. at 178.)

Plaintiff began receiving social services from Carlton County and an individual community support plan was established for her in July 2002.  (Id. at 528-29.)  Marcia Opstad was Plaintiff's case manager and met with Plaintiff weekly.  (Id. at 528.)  Plaintiff's goals were to stabilize her mental health through visits with a psychiatrist and therapy sessions, to have unsupervised home visits with her children, and to get her driver's license.  (Id.)

Plaintiff continued psychotherapy with Joan Heimsness, a licensed clinical social worker. (Id. at 254.)  After Plaintiff was established in a new apartment and had a lawyer for her divorce and custody issues, she was optimistic.  (Id.)  She was participating in a Healthy Living day treatment group and planning to attend AA.  (Id.)  Plaintiff's tension and anxiety increased, however, when she worried about not getting custody of her children.  (Id. at 251-52.)

Plaintiff underwent a psychiatric evaluation with Dr. John Glick at the Human Development Center on August 15, 2002.  (Id. at 186-97.)  Dr. Glick had treated Plaintiff in the past, but Plaintiff had discontinued treatment in December 2000.  (Id. at 186.)  Dr. Glick noted that Plaintiff had a significant abuse history, with post-traumatic symptoms and pseudoseizures in the past.  (Id.)  Dr. Glick diagnosed adjustment disorder with mixed anxiety and depression; history of cannabis and methamphetamine dependence in remission; borderline[1] and dependent[2]

---

[1] "The essential feature of Borderline Personality Disorder is a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity that

traits; mitral valve prolapse and migraine headaches; and a Global Assessment of Functioning

(GAF) score of 60.[3]  (Id. at 187.)  Dr. Glick opined that he would include post-traumatic stress

disorder, bipolar disorder, cyclothymia, and major depressive disorder in his differential

diagnosis.  (Id.)  He felt that Plaintiff's divorce, sobriety, medications, and increased support

were helping her condition.  (Id.)

In October 2002, Plaintiff entered a chemical dependency treatment program, Liberalis.

(Id. at 246.)  A month later, Plaintiff reported that she enjoyed the treatment program, and she

was taking classes for her GED.  (Id. at 241.)  She was granted unsupervised visits with her

children.  (Id.)  Plaintiff moved to a halfway house in January 2003.  (Id. at 237-39.)

After returning home from the halfway house, Plaintiff was positive and optimistic.  (Id.

at 236.)  She was proud to have gotten her driver's license.  (Id.)  Plaintiff's goals were to abstain

from any chemicals and work on her anger.  (Id.)  Ms. Heimsness noted she would see Plaintiff

on a weekly basis.  (Id.)

Ms. Opstad completed a Functional Assessment report regarding Plaintiff on February

28, 2003.  (Id. at 502-03.)  She noted Plaintiff had only moderate problems with mental health

symptoms, which had caused her dismissal from a halfway house.  (Id. at 502.)  She opined that

_____

begins by early adulthood and is present in a variety of contexts."  American Psychiatric
Association, Diagnostic and Statistical Manual of Mental Disorders 650 (4th ed. text revision
2000) ("DSM-IV-TR").

[2] "The essential feature of Dependent Personality Disorder is pervasive and excessive
need to be taken care of that leads to submissive and clinging behavior and fears of separation."
DSM-IV-TR at 665.

[3] A GAF score of 51-60 indicates moderate symptoms or moderate difficulties in social,
occupational, or school functioning.  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (citing
American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32
(4th ed. 1994)).

Plaintiff had severe problems with drugs or alcohol, but noted that she attended Liberalis aftercare and AA.  (Id.)  She opined that Plaintiff had slight problems with social functioning because she had issues with friends.  (Id.)

On March 27, 2003, Plaintiff talked about a difficulty she was having with another woman who was in her group therapy.  (Id. at 232.)  Plaintiff improved the next week, though, and reported that visits with her children were going well but that she was struggling in her relationship with her mother.  (Id. at 230.)  Plaintiff was in a car accident near the end of March and was bruised and traumatized.  (Id. at 231.)

Plaintiff was excited about being sober for nine months as of May 2003.  (Id. at 226.)  She was feeling good emotionally, other than irritability dealing with her estranged husband.  (Id.)  Plaintiff's condition changed in August, and she complained of pain, achy joints, headaches, and a swollen lymph gland.  (Id. at 215.)  Ms. Heimsness described Plaintiff as very intense, stressed, on edge, and irritable, and attributed part of the stress to an upcoming court date.  (Id.)

Plaintiff moved to a new home in October, and was preparing it in hopes of getting joint custody of her children.  (Id. at 207.)  Plaintiff admitted being stressed and having difficulty when her children tested her patience.  (Id.)  She was still going to school, but had to quit a part-time job at the school due to problems with her hip and knee.  (Id.)  Dr. Mark Carlson diagnosed patellofemoral dislocation and recommended a knee immobilizer.  (Id.)

Plaintiff began seeing a chiropractor almost daily for two months beginning in March 2004.  (Id. at 283-87.)  She reported having headaches, back, hip, and knee pain.  (Id. at 287.)  The chiropractor diagnosed "obvious sprain/strain syndrome" because most of the symptoms began after a car accident.  (Id.)  Plaintiff was also treated in an emergency room after having

migraine headaches for seven days.  (Id. at 572.)  She was told to follow-up with Dr. Thiessen, who prescribed Oxycodone.  (Id. at 354-55.)

Plaintiff's condition continued to vacillate over the next few months.  On July 3, 2004, Dr. Thiessen remarked that Plaintiff's "mood and affect are the best I have ever heard."  (Id. at 361.)  He diagnosed manic depression, well-controlled.  (Id.)  Plaintiff reported to Ms. Heimsness that she was working at a tanning salon when she did not have custody of her children.  (Id. at 425.)  Plaintiff also reported being in a power struggle with her oldest daughter, who chose not to visit Plaintiff.  (Id.)

Later that month, Plaintiff was upset after a urinalysis taken by Human Services at her work site was positive for marijuana.  (Id. at 423-24.)  Plaintiff was angry with her landlord, her boss, and her Human Services workers.  (Id.)  She was also disappointed that her daughter did not want to visit her.  (Id.)   Plaintiff reported being unable to sleep and having stress, tension, and headaches.  (Id. at 421.)

In August 2004, Plaintiff began having regular headaches.  (Id. at 359-60.)  She was diagnosed with left trochanteric bursitis and regional myofascial pain syndrome.  (Id. at 358.)  Dr. Thiessen opined that Plaintiff's depression and anxiety were fairly well-controlled.  (Id.)

Joan Heimsness completed a "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" on Plaintiff's behalf on August 11, 2004.  (Id. at 288-89.)  She opined that Plaintiff would have poor to no ability to understand, remember, or carry out detailed instructions or accept instructions and respond appropriately to criticism from supervisors.  (Id. at 288.)  Ms. Heimsness explained that Plaintiff has a short attention span, is very sensitive to criticism, and overreacts.  (Id. at 289.)  She opined that Plaintiff would have a fair ability to do a number of other work-related activities including maintaining attention for a two-hour segment

and working in proximity to others without being unduly distracted.  (Id. at 288.)  She rated

Plaintiff "fair to good" on her ability to maintain regular attendance, be punctual, and behave in

an emotionally stable manner.  (Id. at 288.)  Ms. Heimsness also made the following comments

about Plaintiff's ability to work:

> Recently had a relapse in her marijuana use - had been abstinate 22 months.
> Impulsive behavior choices - borderline and dependent personality traits are of
> long duration - looks for and needs attention and acceptance - low self esteem
> affects choices she makes and relationships she establishes - long history of
> conflictual relationships - "wears emotions on her sleeve" - emotional "ups and
> downs."

(Id. at 289.)  She opined that Plaintiff would miss work more than three times a month "pending

other things going on in her personal life."  (Id.)

Ms. Heimsness noted in a letter dated August 19, 2004, that Plaintiff's experience in

group therapy was suggestive of how Plaintiff would handle being in a full-time work situation,

in that she had difficulty maintaining regular attendance due to issues regarding her children.

(Id. at 419.)  She opined that Plaintiff "experiences highs and lows and has reactive difficulty in

maintaining constant relationships."  (Id. at 420.)

Plaintiff saw Dr. Thiessen after her relapse of using marijuana.  (Id. at 349.)  Over the

next month, Dr. Thiessen counseled Plaintiff for depression and anxiety related to her ongoing

custody dispute.  (Id. 346-47.)  Plaintiff spoke to Ms. Heimsness about her upcoming custody

battle and also reported that her work at the tanning salon was not going well.  (Id. at 416-17.)

Plaintiff was visibly stressed.  (Id. at 416.)

Plaintiff went to an emergency room on August 22, 2004, and complained of tingling in

her face, fingers, toes, arms and legs.  (Id. at 570.)  She was diagnosed with a panic attack.  (Id.)

Plaintiff returned to the emergency room six days later with low back pain and was treated with

Lortab.  (Id. at 569.)

In September 2004, Plaintiff was discharged from the Liberalis chemical dependency treatment program after approximately two and half weeks.  (Id. at 534.)  Her counselor stated, "She did not appear to make any behavioral changes while she was here and it is clear that she needs extended supervision to assist her to develop and maintain recovery behaviors."  (Id.)

Plaintiff underwent a psychological consultative examination with Dr. Lyle Wagner on October 8, 2004.  (Id. at 299-303.)  When Dr. Wagner asked Plaintiff what prevented her from working, she stated, "I don't have the education or motivation to work.  I get bored really fast, and if I don't like it, I won't do it."  (Id. at 299.)  Plaintiff had been a stay-at-home mom for the last thirteen years.  (Id. at 300.)  Plaintiff rated her daily depression as an eight out of ten.  (Id.)  She also reported middle and late night insomnia and being chronically tired, even when she took Trazadone and Seroquel for sleep.  (Id.)  She was eating only once a day, feeling hopeless and irritable, crying almost daily, and generally experiencing a poor energy level.  (Id.)  Dr. Wagner estimated Plaintiff's intelligence to be low-average.  (Id. at 301.)

Plaintiff reported that she attended the Willow River Adult Learning Program two to four hours a day, Monday through Friday.  (Id. at 302.)  She had custody of her children alternately every two weeks.  (Id.)  She reported that she did the grocery shopping, cooking, laundry, and household chores.  (Id.)  Dr. Wagner diagnosed Plaintiff with bipolar disorder, depressed; and assigned a GAF score of 58.  (Id. at 303.)  He noted that Plaintiff was taking Trazadone, Seroquel, Celexa, and Buspar, and attending psychotherapy with Ms. Heimsness.  (Id.)  Dr. Wagner gave the following Medical Source Statement:

> Regarding her ability to concentrate on, understand and remember instructions, she has the ability to understand and retain simple to moderately-complex instructions.  Regarding her ability to work at a reasonable pace, to complete a

particular task, for the most part, she has the ability to do this.  For example, she is currently attending school two to four hours per day, working towards her high-school diploma.  Although this is not a direct work experience, it is similar to work, in that she must have projects or tasks to complete, which she must do to attain her educational goals.  Regarding her ability to tolerate coworkers, the public, and handle supervision, this is a bit of an unknown, since she has not worked in over thirteen years.  She does have some fluctuating moods, and other evaluators have diagnosed her with Borderline Personality Traits, and if these indications are valid, she would perhaps have some difficulty with the public, coworkers, and supervisors.  Regarding her ability to manage stress and pressure in a work setting, she may have some difficulty in this area, due to her level of depression and personality issues.

(Id. at 301.)  Dr. Wagner opined there was a high probability that Plaintiff "had issues" on Axis II diagnostically,[4] but thought he would need additional time to rule specific issues in or out.  (Id. at 303.)

On November 3, 2004, Plaintiff reported that the owner of the tanning salon where she worked had turned the salon over to her.  (Id. at 411.)  She planned to run it alone, and business was picking up.  (Id.)  Plaintiff was feeling good, attending AA every night and church on Sunday.  (Id.)

Plaintiff was referred to the Human Development Center for a psychological assessment with Dr. Dan D'Allaird.  (Id. at 323.)  Plaintiff's son had been diagnosed with ADHD, and Plaintiff was concerned about her own attention span, especially in the context of trying to earn her GED.  (Id.)  The results of a WAIS-III test indicated that Plaintiff functioned in the low-average range of intelligence.  (Id.)  Her scores were consistent with a diagnosis of ADHD.  (Id. at 326.)  Plaintiff was diagnosed with ADHD, NOS; and a learning disorder, NOS, with dyslexic features.  (Id. at 328.)

---

[4] Axis II is for reporting personality disorders and mental retardation, and may also be used for noting prominent maladaptive personality features and defense mechanisms.  DSM-IV-TR at 26.

On December 16, 2004, Plaintiff fainted while at a courthouse.  (Id. at 338.)  After she was discharged from the emergency room, Plaintiff called Dr. D'Allaird and reported being very upset, but not suicidal, because she had lost custody of her children.  (Id. at 406.)

About a week later, Plaintiff saw Dr. Thiessen for an acute exacerbation of depression and anxiety.  (Id. at 343.)  Her depression was much worse, and Dr. Thiessen thought she could not pursue her job in the tanning salon.  (Id.)  Dr. Thiessen found Plaintiff to be disabled from work due to depression and anxiety, but he expected this to last no longer than six months.  (Id.)  Plaintiff continued to work at the tanning salon, although she did not earn any income.  (Id. at 401.)  Several months later, Plaintiff went to the salon and learned it had been sold, and she no longer had a job.  (Id. at 443.)

Plaintiff was treated in an emergency room for arm and chest pain on December 27, 2004.  (Id. at 564.)  She was diagnosed with costochondritis[5] and treated with Ibuprofen.  (Id.)

On January 12, 2005, Dr. Thiessen saw Plaintiff on an urgent basis for medication changes.  (Id. at 342.)  Plaintiff reported having suicidal ideation and having been treated in an emergency room for a severe panic attack.  (Id.)  Dr. Thiessen increased her Quetiapine and started her on Mirtazapine.  (Id.)  In a follow-up appointment, Dr. Thiessen noted that Plaintiff was quite depressed, but stable.  (Id. at 398.)  He started her on Atomoxetine for treatment of ADHD.  (Id.)

It was arranged for Plaintiff to have a community support worker, Jennifer Isaac, beginning in February.  (Id. at 388-89.)  Plaintiff hoped Ms. Isaac could help her regain custody

---

[5] Costochondritis is an inflammation of one or more costal cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate.  Stedman's Medical Dictionary 418 (27th ed. 2000).

of her children.  (Id. at 388.)  She also expressed hope about passing the GED without doing

classroom work.  (Id.)

On April 27, 2005, Plaintiff was taken to an emergency room after her arms and legs

became tingly and heavy.  (Id. at 557-58.)  She was diagnosed with anxiety and stress.  (Id. at

557.)  In May, after a period of isolating herself, Plaintiff improved with the help of Ms. Isaac.

(Id. at 435.)

Plaintiff's case worker, Ms. Opstad, described the following issues that would greatly

compromise Plaintiff's ability to work:

> Short attention span - inability to focus on one thing very long.
> Ms. Halverson moves from issue to issue and situation to situation.
> She has very poor follow through and poor impulse control.
>
> Her diagnostic work from the Human Development Center reflects
> both ADHD and dyslexia . . . .
>
> Ms. Halverson has difficulties with boundaries and limit setting.
> This creates a great deal of chaos in her life.  Her relationships
> with family, friends and others reflect constant problems.  You will
> note many such examples in my notes.  She is currently at odds
> with both of her parent[s], her ex-husband, her children, her
> neighbors (there are currently order for protection issues between
> her and one of her neighbors), her landlord, many friends, etc.  For
> this reason alone, I would believe that Ms. Halverson would have a
> very difficult time maintaining a job.
>
> Ms. Halverson also suffers from very unstable moods.  I am aware
> of several periods of time when she has not been able to leave her
> house and appeared pretty severely depressed.  She is on
> medications, but these swings still seem to occur.

(Id. at 426, 428.)

Dr. Thiessen found Plaintiff's symptoms of anxiety and depression to be stable in August

2005.  (Id. at 621.)  Plaintiff reported feeling stable for the last several months.  (Id. at 620.)

Beginning in January 2006, Plaintiff was unable to refill her medications, and her anxiety

and depression symptoms increased.  (Id. at 604.)  She was more emotional and irritable.  (Id.)

By March, Plaintiff's suicidal obsessions had decreased after she was given a temporary increase

of Quetiapine, but she appeared run down and somewhat emotional.  (Id. at 603.)  Plaintiff

reported using marijuana frequently and vomiting in order to lose weight.  (Id. at 602.)  Plaintiff

also complained of skeletal pain and reported she was being tested for fibromyalgia.  (Id. at 638.)

In April, Plaintiff was having suicidal thoughts.  (Id. at 637.)  Ms. Heimsness opined that

Plaintiff was a high-risk client who needed regular monitoring of her mental health symptoms.

(Id.)

        When Plaintiff saw Dr. Thiessen in May 2006, she was focused much more on her pain

than on her depression.  (Id. at 600.)  Plaintiff reported tenderness to palpation, especially over

the major muscle groups.  (Id.)  Dr. Thiessen diagnosed fibromyalgia.  (Id. at 601.)  In July,

Plaintiff again reported suicidal ideation and stress from losing two friendships.  (Id. at 657.)

        **D.      Vocational Expert Testimony**

        Edward Utities testified as a vocational expert (VE) at the hearing before the ALJ.  (Id. at

672, 688-92.)  The ALJ posed a hypothetical question to the VE about an individual of Plaintiff's

age, education, and work experience, with severe impairments of depression, anxiety,

fibromyalgia, and bursitis; with moderate limitations in social functioning and maintaining

concentration, persistence, or pace; who is capable of performing sedentary work; who can only

occasionally climb ramps and stairs; who cannot climb ropes, ladders or scaffolds; who would

require a sit/stand option at 40 minute intervals; who can only occasionally stoop, crouch, kneel

or crawl; who cannot work at heights or around hazards or hazardous machinery; who cannot

engage in more than occasional overhead reaching with the left upper extremity; with no more

than frequent overhead reaching with the right upper extremity; with no more than frequent

13

handling, fingering, or feeling with either hand; who would have the capacity to concentrate on, understand, and remember routine, repetitive instructions; who could carry out routine, repetitive tasks and unskilled work; who could interact and get along with co-workers and the public on a brief and superficial basis with infrequent contact; who could function with ordinary levels of supervision; and who could tolerate the routine stressors of a routine, repetitive low-stress work setting. (Id. at 689-90.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform bench work assembly jobs such as final assembler, lens inserter, lampshade assembler, compact assembler, fishing reel assembler, and other jobs such as sorter, table worker, and dowel inspector.  (Id. at 690-92.)

The ALJ asked the VE whether the same hypothetical individual as above, who had marked limitations in maintaining concentration, persistence, and pace; who could not concentrate on, understand, and remember routine repetitive instructions or carry out routine repetitive tasks in unskilled work; and who could not tolerate the stressors of a routine, repetitive, low-stress work setting, could perform Plaintiff's past relevant work or any other jobs. (Id. at 692.)  The VE testified that there were no jobs such a person could perform.  (Id.)

### E.    The ALJ's Decision

The ALJ issued an unfavorable decision on October 19, 2006.  (Id. at 12-24.)  In finding that Plaintiff was not disabled, the ALJ employed the required five-step evaluation, considering: (1) whether Plaintiff was engaged in substantial gainful activity; (2) whether Plaintiff had a severe impairment; (3) whether Plaintiff's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Plaintiff was capable of returning to past work; and (5) whether Plaintiff could do other work existing in significant numbers in the regional or national economy.  See 20 C.F.R. § 416.920(a)-(f).

At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 1, 2003.  (Admin. R. at 17.) At the second step, the ALJ found that Plaintiff had severe impairments of bipolar disorder with depression, anxiety disorder, attention deficit hyperactivity disorder, polysubstance abuse disorder, chronic headaches, trochanteric bursitis of the left shoulder, and degenerative disc disease.  (Id.)

 At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)  The ALJ found that Plaintiff had no area of functioning limited to a marked degree by her mental impairments, which precluded her from meeting or equaling a mental impairment listing.  (Id.)

At step four of the evaluation, the ALJ was required to consider Plaintiff's subjective complaints as well as objective medical evidence.  (Id.)  The ALJ found that Plaintiff's bipolar disorder, anxiety disorder, ADHD, and polysubstance abuse disorder resulted in mild restrictions of her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation.  (Id. at 20.)

The ALJ found Plaintiff's course of treatment inconsistent with disabling mental impairments.  (Id. at 21.)  The ALJ recognized that Plaintiff saw a social worker on a regular basis and participated in group therapy, but noted she had not been hospitalized since her alleged disability date.  (Id.)  The ALJ characterized Plaintiff as not requiring extensive mental health services, noting she took her medication regularly and focused on her home and family with her social worker.  (Id.)  The ALJ remarked that Plaintiff had been unsuccessful in completing

chemical dependency treatment.  (Id.)  The ALJ concluded that Plaintiff's conservative course of treatment was inconsistent with disability.  (Id.)

The ALJ next considered the opinion evidence.  (Id. at 21.)  The ALJ placed significant weight on the opinions of Dr. Wagner, the consultative examining psychologist, and Dr. Shields and Dr. Larson, the state agency consultants.  (Id.)

The ALJ declined to place significant weight on the opinion of Ms. Heimsness, Plaintiff's social worker.  (Id. at 21.)  The ALJ stated that Ms. Heimsness was not an acceptable medical source and found her opinion inconsistent with her treatment notes, which indicated Plaintiff was handling her problems appropriately and focusing on her home and family.  (Id. at 21-22.)  The ALJ also declined to place significant weight on the opinion of Ms. Opstad, the behavior analyst, because she was not an acceptable medical source and because her opinion was not substantiated by any objective testing and appeared to be based on Plaintiff's subjective reports.  (Id.)

The ALJ found little objective evidence to support significant limitations from Plaintiff's physical impairments and noted that Plaintiff was treated conservatively with pain medication, stretching, and muscle relaxers.  (Id. at 22.)  The ALJ also noted that Plaintiff was able to engage in some work activity because she had worked at a tanning salon for at least three months and attended an adult learning program.  (Id.)  The ALJ gave some weight to the state agency medical doctor's opinion of Plaintiff's physical residual functional capacity but limited her to sedentary work to accommodate her subjective complaints.  (Id. at 22-23.)  The ALJ found Plaintiff to have the residual functional capacity to:

> lift and carry 10 pounds occasionally, and 5 pounds frequently and can stand and/or walk for 2 hours and sit for 6 hours in an 8 hour workday.  Claimant can only occasionally climb stairs and ramps and never climb ladders, ropes, and scaffolds, can occasionally stoop, crouch, kneel and crawl.  She cannot work at heights or

16

around hazards or hazardous machinery or reach overhead with the left upper extremity more than occasionally.  Claimant can frequently reach overhead with the right upper extremity, non-overhead reach, handle, finger and feel with either hand.  In addition, claimant can remember and understand routine, repetitive instructions and tasks in unskilled work with brief, superficial and infrequent contact with the public and coworkers and can handle the ordinary level of supervision found in most customary work settings and can handle the ordinary stressors of routine, repetitive work.

(Id. at 18.)  The ALJ determined that Plaintiff could not perform her past relevant work at the light exertional level.  (Id. at 23.)  However, he found that according to the medical-vocational rules and the testimony of the vocational expert, Plaintiff could perform other work existing in significant numbers in the national economy such as bench work assembler and sorter.  (Id. at 23-24.)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(2)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

### A.    Administrative Review

If a claimant's initial application for benefits is denied, he or she may request

reconsideration of the decision.  20 C.F.R. § 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  Id. § 416.1429.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  Id. § 416.1467.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g); 20 C.F.R. § 416.1481.

**B.      Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.      The credibility findings made by the ALJ.
2.      The plaintiff's vocational factors.
3.      The medical evidence from treating and consulting physicians.
4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5.      Any corroboration by third parties of the plaintiff's impairments.
6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider, "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent conclusions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.   DISCUSSION

Plaintiff alleges several errors in the ALJ's evaluation of her disability claim.  First, Plaintiff argues the ALJ erred by failing to evaluate the opinions of Ms. Heimsness, Ms. Opstad, and Ms. Isaac in accordance with 20 C.F.R. § 416.913(d), Social Security Ruling (SSR) 06-03p, and 20 C.F.R. § 416.927(d).  Second, Plaintiff contends the ALJ erred by failing to have a medical expert opine on whether Plaintiff met or equaled a listed mental impairment.  Third, Plaintiff asserts the ALJ erred in his credibility analysis by making unsupported assumptions and conclusions and failing to consider the effect of mental impairments on her perception of pain.  Fourth, Plaintiff alleges the ALJ erred by relying on VE testimony in response to a faulty hypothetical question.

### A.   Whether the ALJ Was Required to Obtain the Opinion of a Medical Expert

Plaintiff argues the ALJ failed to fully and fairly develop the record at step three by not obtaining a medical source opinion on whether Plaintiff met or equaled a listed impairment.  A

19

claimant whose impairment meets or equals the severity of a listed impairment is presumptively

disabled and no further inquiry is required.  Brosnahan v. Barnhart, 336 F.3d 671, 676 (8th Cir.

2003).  To meet or equal Listing 12.04 for affective disorders, or 12.06 for anxiety-related

disorders, the claimant must meet at least two "category B" requirements of (1) marked

restriction in daily living activities; (2) marked difficulties in social functioning; (3) marked

difficulties in concentration, persistence, or pace; and (4) repeated episodes of decompensation.

Id. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2003)); see also § 12.06.  Plaintiff

contends the opinions of Ms. Heimsness, Ms. Opstad, and Ms. Isaac show marked limitations in

social functioning and in maintaining concentration, persistence, or pace.

The only specific medical opinions regarding listed impairments were offered by non-

examining source reviewers in September and November 2004, before much of the evidence was

incorporated into the record.  However, as  Defendant correctly asserts, Dr. Dan Larson, a state

agency psychologist, also reviewed the record in April 2005 and determined that Plaintiff did not

meet or equal a listed impairment.  Dr. Larson affirmed Dr. Shields' earlier opinion that Plaintiff

was no more than moderately impaired in sustaining concentration, persistence, and pace, and in

social functioning.  (Id. at 318-20.)

SSR 96-6p states, in relevant part:

[A]n administrative law judge and the Appeals Council must obtain an updated
medical opinion from a medical expert in the following circumstances:

. . .

When additional medical evidence is received that in the opinion of the
administrative law judge or the Appeals Council may change the State
agency medical or psychological consultant's finding that the
impairment(s) is not equivalent in severity to any impairment in the
Listing of Impairments.

> When an updated medical judgment as to medical equivalence is required at the administrative law judge level in either of the circumstances above, the administrative law judge must call on a medical expert.

The issue, therefore, is whether evidence after April 2005 exists showing that Plaintiff was markedly impaired in two areas of functioning.

In May 2005, Ms. Opstad, Plaintiff's case worker, opined that Plaintiff's ADHD, her difficulties in relationships, and unstable moods would make it very difficult for her to work. (Id. at 426, 428.)  Ms. Opstad offered her treatment notes for the years 2002-05 in support of her opinion.  (Id. at 428-531.)  Although this evidence could support a conclusion that Plaintiff was markedly impaired in social functioning and maintaining persistence and pace, similar evidence was reviewed by the state agency consultants.  For example, the record contained the psychological assessment wherein Plaintiff was diagnosed with ADHD.  (Id. at 323-32.)  The record also contained evidence of Plaintiff's unstable mood (id. at 178, 288-89, 215, 251, 342-43, 370, 406, 502, 570) and difficulty in her relationships (id. at 288-89, 300, 370, 423, 502).  Essentially, the evidence not reviewed by the state agency consultants was no different from the evidence they did review.  Thus, the ALJ would have little reason to believe the additional evidence would have changed their opinions that Plaintiff did not meet or equal a listed mental impairment.  Under the circumstances, the ALJ was not required to seek another medical expert's opinion on whether Plaintiff met or equaled a listed impairment.

**B.      Whether the ALJ Erred in His Credibility Analysis and Determination of Plaintiff's Residual Functional Capacity**

Plaintiff challenges several aspects of the ALJ's credibility analysis and determination of her residual functional capacity.  First, Plaintiff argues the ALJ failed to evaluate the opinions of Ms. Heimsness, Ms. Opstad, and Ms. Isaac as required by the regulations and SSR 06-03p.

Second, Plaintiff argues the ALJ erred by granting significant weight to Dr. Wagner's opinion. Third, Plaintiff contends the ALJ ignored much of the evidence and made unwarranted conclusions.

### 1.    Opinion Evidence

In assessing the opinion evidence in the record, the ALJ said he considered the opinions of Ms. Heimsness and Ms. Opstad but declined to place significant weight on their opinions because they were not acceptable medical sources.  (Id. at 21.)  The ALJ did not consider the opinion of Ms. Isaac, who also testified at the hearing.

A treating source is a physician or psychologist or other acceptable medical source who treats the claimant.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).  Acceptable medical sources include licensed physicians, licensed or certified psychologists and school psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 416.913(a).  The regulations also refer to "other sources," which are separated into medical sources and non-medical sources.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 416.902).  Medical sources include, among others, licensed clinical social workers and therapists.  Id. (citing 20 C.F.R. § 416.913(d)).  Non-medical sources include public and private social welfare agency personnel and others.  Id.

SSR 06-03p clarifies existing policies on evaluating opinions from individuals who are not acceptable medical sources.  Sloan, 499 F.3d at 888.  The purpose of SSR 06-03p was to recognize an emphasis in recent years to contain medical costs by using medical sources such as nurse practitioners, physician assistants, and others to treat and evaluate patients, and to compensate for the fact that these individuals are not technically deemed acceptable medical sources under Social Security rules.  SSR 06-3p.  Under the Ruling, the factors the ALJ should

consider regarding "other opinion evidence" are how long the source has known the claimant, how frequently the source has seen the claimant, how consistent the opinion is with other evidence, the degree to which the source presents evidence to support the opinion, how well the source explains the opinion, whether the source has an area of expertise related to the claimant's impairments, and any other factors that refute or support the opinion.  Id.; see also Sloan, 499 F.3d at 889.

Here, the ALJ's analysis of "other opinion evidence" suggests he did not properly consider all of the relevant factors.  The only factor cited by the ALJ in evaluating Ms. Opstad's opinion was that the opinion was not based on objective testing.  One would not expect that a social services case manager, who had frequent contact with her client in helping her obtain a variety of services, would base her opinion of the client's abilities on objective testing, as opposed to her observations and experiences with her client.  The ALJ therefore erred in not considering Ms. Opstad's frequent contact with Plaintiff, her observations of Plaintiff's abilities to get along with other people, and the notes of her contact with Plaintiff, which Ms. Opstad offered in support of her opinion.

Ms. Heimsness is a licensed social worker who treated Plaintiff in psychotherapy in the years 2002 through 2006.  In analyzing Ms. Heimsness' opinion, the ALJ remarked that Plaintiff was "handling her problems appropriately" and "focused on her home and family."  (Id. at 22.)  Thus, the ALJ found Ms. Heimsness' opinion to be inconsistent with the overall record.  (Id.)

Plaintiff's background of long-standing mental impairments, brief work history, and problematic family situation is the starting point in evaluating this case.  Plaintiff applied for SSI benefits when her mental heath deteriorated as a result of her impending divorce and custody proceedings.  In June 2002, Plaintiff overdosed on Tylenol when her husband said he wanted a

divorce.  Plaintiff struggled through a difficult divorce and custody dispute, with the help of a

social services case worker, Ms. Opstad, and psychotherapy with Ms. Heimsness.  Plaintiff

sought chemical dependency treatment, entered school to obtain her GED, and prepared a new

home in hopes that her children would live there.  At times, Plaintiff felt good about these steps

and positive about her future.  At other times, though, she handled the stress of her situation

poorly.  Although Plaintiff improved after her hospitalization in June 2002, her depression and

anxiety increased greatly when she lost custody of her children in December 2004.  This is the

situation the ALJ characterized over-simply as "focused on her home and family."  Conceivably,

when the ALJ said that Plaintiff was handling her problems appropriately, he might have been

referring to Plaintiff's attempts to get her GED and complete chemical dependency treatment,

but this characterization is contrary to the facts that Plaintiff dropped out of the GED program

and was dismissed from chemical dependency treatment programs.  The ALJ gave significant

weight to the opinion of Dr. Wagner, the consultative psychological examiner, and the state

agency consultants, Dr. Shields and Dr. Larson, because he found these doctors were in a good

position to accurately assess Plaintiff's limitations, having reviewed the medical records.  (Id. at

21.)  Yet the ALJ failed to explain why the opinions of these consultants were credited over the

knowledgeable opinions of Ms. Heimsness and Ms. Opstad.

Moreover, as Plaintiff argues, Dr. Wagner's opinion is inconsistent with the record.  For

example, Dr. Wagner based his opinion on Plaintiff's ability to attend school two to four hours a

day.  Dr. Wagner stated Plaintiff's school attendance was similar to work "in that she must have

projects or tasks to complete, which she must do to attain her educational goals."  Plaintiff

argues this reasoning is flawed because the goal of the educational program was to pass the GED

test, which she failed to do.  Plaintiff also persuasively argues that spending two to four hours a

day in a classroom does not indicate the ability to engage in full-time competitive employment. The Court agrees that Plaintiff's ability to attend school several hours a day in and of itself does not indicate that she can engage in full-time competitive work. See Baker v. Apfel, 159 F.3d 1140, 1146 (8th Cir. 1998) (attending class for four hours a day with accommodations was not indicative of ability to work a full shift).

Dr. Wagner's opinion suffers from another deficiency, as well. Dr. Wagner believed Plaintiff to have Axis II issues, but felt he did not have enough information to provide a certain diagnosis. Dr. Wagner stated that Plaintiff's ability to tolerate coworkers, the public, and handle supervision was a bit unknown. This statement is significant for several reasons: (1) Plaintiff's former treating psychiatrist, Dr. Glick, had diagnosed Plaintiff with borderline and dependent personality traits; (2) Ms. Heimsness stated that these traits were of long duration and affected Plaintiff's relationships with others; and (3) Ms. Opstad noted Plaintiff to have constant problems in relationships. Thus, Dr. Wagner's opinion regarding Plaintiff's ability to interact with supervisors, co-workers, and the public was no better supported by the evidence than either Ms. Heimsness' or Ms. Opstad's opinions. The ALJ therefore erred in granting significant weight to Dr. Wagner's opinion. The same is true of the state agency consultants, Dr. Shields and Dr. Larson, who did not discuss any evidence of borderline and dependent personality traits in support of their opinions.

Accordingly, the case should be remanded for further development on the issue of the functional limitations from Plaintiff's borderline and dependent personality traits and, if necessary, to obtain additional evidence on Plaintiff's Axis II diagnosis. As part of the overall analysis of this issue, the ALJ should reevaluate the opinion evidence of Ms. Opstad, Ms. Heimsness, and Ms. Isaac in accordance with SSR 06-3p.

25

### 2.    Credibility of Plaintiff's Subjective Complaints

Plaintiff challenges a number of statements the ALJ made in support of his credibility determination.  In assessing subjective complaints, an ALJ must consider: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Other relevant factors are the claimant's work history and the objective medical evidence.  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (citing Polaski, 739 F.2d at 1322).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility." Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).  The ALJ may discount subjective complaints when they are inconsistent with the evidence as a whole.  Id. (citing Polaski, 739 F.2d at 1322).

Plaintiff first challenges the ALJ's statement that Plaintiff's ADHD medication controls her symptoms.  The record indicates that Plaintiff was prescribed Atomoxetine for ADHD in January 2005.  (Admin. R. at 398.)  Plaintiff discontinued this drug the following summer because it made her nauseous.  (Id. at 620.)  Based on their frequent contact with Plaintiff, both Ms. Heimsness and Ms. Opstad opined that Plaintiff had a short attention span, and Ms. Opstad also opined that Plaintiff had poor impulse control.  (Id. at 289, 426.)  The evidence does not support the ALJ's conclusion that Plaintiff's ADHD symptoms were controlled by medication.

Plaintiff next disputes the ALJ's finding that her social functioning was only moderately impaired, based on two statements by the ALJ.  First, the ALJ noted that Plaintiff went on a trip to Virginia with friends, but he did not ask whether Plaintiff got along well with her friends on

the trip.  Second, the ALJ asserted that Plaintiff lived independently and had no difficulty getting along with her children.

The ALJ's finding that Plaintiff lived independently and had no difficulty getting along with her children is not supported by substantial evidence of record.  Dr. Thiessen's records indicate that Plaintiff threw knives into the wall in her home when she suffered a flare-up of depression with schizophrenic features in May 2002.  (Id. at 370.)  Plaintiff had only supervised visits with her children when she first separated from her husband, and Plaintiff was upset when her oldest daughter refused to visit her.  (Id. at 241, 423, 425.)  In December 2004, Plaintiff lost custody of her children.  (Id. at 406.)  Ms. Opstad opined that Plaintiff's "relationships with family, friends and others reflect constant problems."  (Id. at 428.)

Plaintiff also challenges the ALJ's statement that no one assessed her with fibromyalgia.  She points out, correctly, that Dr. Thiessen diagnosed her with fibromyalgia in May 2006, although the record does not indicate how he reached his diagnosis.  (Id. at 601.)  The ALJ included fibromyalgia in the hypothetical question posed to the vocational expert and largely credited Plaintiff's subjective complaints of pain by reducing her physical residual functional capacity to a limited range of sedentary work.  Plaintiff does not explain how the ALJ's erroneous statement that no doctor diagnosed her with fibromyalgia resulted in an actual error in the residual functional capacity determination.

It is true, however, as Plaintiff further alleges, that the ALJ failed to discuss evidence of a psychological origin to her pain.  (Id. at 187 (pseudoseizures), 552 (psychogenic symptoms), 599 (pain varies with mental state), 604 (somatic symptoms).)  The ALJ may not ignore such evidence.  See Pratt v. Sullivan, 956 F.2d 830, 835-36 (8th Cir. 1992) (ALJ must consider effects of mental impairments in combination with effects of physical impairments in determining

27

residual functional capacity, and must examine the possibility that psychological impairment aggravates claimant's perception of pain.)

Plaintiff next argues that the ALJ erred in concluding that the relatively conservative course of treatment for Plaintiff's mental impairments indicates that her impairments are not as limiting as she asserts.  As Plaintiff notes, she was hospitalized for a suicide attempt in June 2002, has been in therapy since 2002, has a community support worker coming to her home to help her, and at the time of the hearing, was taking seven medications for mental impairments. Contrary to the ALJ's finding, Plaintiff's consistent treatment for mental impairments and her recurring symptoms despite treatment support her credibility.  See Van Winkle v. Barnhart, 55 F. App'x 784, 786-87 (8th Cir. 2003) (where claimant consistently sought treatment for mental impairments, ALJ must acknowledge repeated instances of symptomatology despite treatment.)

Finally, Plaintiff challenges the ALJ's conclusion that her work at a tanning salon was inconsistent with her allegation of disability.  Plaintiff's role at the tanning salon is unclear.  The evidence suggests it was a business venture, not a regular job, and she worked irregular hours and was not paid.  (Id. at 401, 416-17, 425, 443.)  There is not enough information in the record to determine how many hours Plaintiff worked or what she was capable of doing.  See Zenker v. Bowen, 872 F.2d 268, 270-71 (8th Cir. 1989) (analyzing Plaintiff's ability to do part-time work). Thus, there is insufficient evidence to support the ALJ's conclusion that she could work in full-time competitive employment.

## C.   Whether the ALJ Propounded a Faulty Hypothetical Question

Plaintiff argues that the hypothetical question posed to the VE was faulty because it did not include the mental limitations described by Ms. Heimsness, Ms. Opstad, and Ms. Isaac.  An ALJ must include all impairments that he accepts as true in his hypothetical question to the VE.

See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  On remand, the ALJ should include all

mental impairments that he accepts as true in a hypothetical question to a vocational expert to

obtain testimony regarding whether Plaintiff can perform her past relevant work or other work.

## IV.    RECOMMENDATION

Plaintiff has requested a reversal of the Commissioner's decision with an outright award

of benefits or, in the alternative, a remand for further development of the case.  Remand is

appropriate in this instance because the ALJ failed to properly evaluate opinion evidence and

several Polaski factors in making his residual functional capacity determination.

In addition, even if the ALJ concludes on remand that Plaintiff is disabled by all of her

physical and mental impairments, the analysis must proceed one step further.  Plaintiff has been

diagnosed with substance abuse disorder, and Ms. Opstad opined that Plaintiff has severe

problems with drugs or alcohol.  (Id. at 17, 502.)  This evidence requires further analysis by the

ALJ of whether drug addiction or alcoholism is a contributing factor material to the

determination of disability.  See 20 C.F.R. § 404.1535.  "An individual shall not be considered to

be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the

Commissioner's determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(c).  The

ALJ must consider which limitations would remain absent the effects of substance abuse

disorders and whether Plaintiff would still be disabled.  See Brueggemann v. Barnhart, 348 F.3d

689, 694-95 (8th Cir. 2003).  "Even though this task is difficult, the ALJ must develop a full and

fair record and support his conclusion with substantial evidence on this point just as he would on

any other."  Id. at 695.


Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 12) be **DENIED** as to

reversal but **GRANTED** as to remand;

2.      Defendant's Motion for Summary Judgment (Doc. No. 19) be **DENIED**; and

3.      This case be remanded to the Commissioner for further proceedings consistent

with this Report and Recommendation.


Dated: January 5, 2009

                                 s/ Susan Richard Nelson
                                SUSAN RICHARD NELSON
                                United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 20, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.